**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ERIC HOLLANDER, Individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>OFFICEMAX INCORPORATED, MAPLEBY HOLDINGS MERGER CORPORATION, MAPLEBY MERGER CORPORATION, RAKESH GANGWAL, RAVICHANDRA K. SALIGRAM, WARREN F. BRYANT, FRANCESCA RUIZ DE LUZURIAGA, JOSEPH M. DEPINTO, V. JAMES MARINO, WILLIAM J. MONTGORIS, DAVID M. SZYMANSKI, OFFICE DEPOT, INC., DOGWOOD MERGER SUB INC., and DOGWOOD MERGER SUB LLC,<br><br>Defendants. | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

**SUMMARY OF THE ACTION**

1.     This is a shareholder class action brought by Plaintiff on behalf of holders of the common stock of OfficeMax Incorporated ("OfficeMax" or "Company") to enjoin the acquisition

of the publicly owned shares of OfficeMax common stock by Office Depot, Inc. ("Office Depot"), Dogwood Merger Sub Inc., ("Merger Sub"), and Dogwood Merger Sub LLC ("Merger Sub 2") as detailed herein ("Proposed Transaction"). Mapleby Holdings Merger Corporation ("Mapleby Holdings") is a subsidiary of OfficeMax and Mapleby Merger Corporation ("Mapleby") is a subsidiary of Mapleby Holdings.

2.      On February 20, 2013, OfficeMax and Office Depot jointly announced that they had entered into a definitive merger agreement under which Office Depot will acquire all of the outstanding shares of OfficeMax in a $1.17 billion stock transfer. Under the terms of the Proposed Transaction, OfficeMax shareholders will receive 2.69 shares of Office Depot common stock for each share of OfficeMax they own ("Merger Agreement").

3.      In facilitating the acquisition of OfficeMax by Office Depot for grossly inadequate consideration and through a flawed process, each of the defendants breached and/or aided the other defendants' breaches of their fiduciary duties. As described in more detail below, given the recent strong performance of OfficeMax, as well its future growth prospects, the consideration shareholders are to receive is inadequate and significantly undervalues the Company.

4.      On April 9, 2013, Office Depot filed a Form S-4 Registration Statement ("Registration Statement") with the US Securities and Exchange Commission containing a joint proxy statement/prospectus, which is the basis upon which OfficeMax shareholders will be asked to make their decision on whether to vote in favor of the Proposed Transaction. The Registration Statement contains financial analysis from J.P. Morgan Securities LLC ("J.P. Morgan"), which was OfficeMax's financial advisor, and Peter J. Solomon Company L.P. ("PJSC") and Morgan Stanley & Co. LLC ("Morgan Stanley"), which were Office Depot's financial advisors. However,

as described herein, the Registration Statement is materially incomplete and fails to disclose information upon which shareholders can make a fully-informed decision on how to vote. The materially misleading Recommendation also violates Section 14 of the Securities and Exchange Act of 1934 ("Exchange Act").

5.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties.

## JURISDICTION AND VENUE

6.     Jurisdiction is founded upon federal question jurisdiction, pursuant to § 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper under 28 U.S.C. § 1391(b)(2) because OfficeMax maintains offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, each of the Individual Defendants as an officer and/or director of the Company has extensive contacts within this District.

## PARTIES

8.     Plaintiff is, and at all relevant times was, a continuous stockholder of defendant OfficeMax.

9.     OfficeMax is a Delaware corporation with its principal executive offices located at 263 Shuman Blvd., Naperville, Illinois 60563.

10.     Defendant Rakesh Gangwal has served as the Chairman of the Board of the Company since November 2010.

11.     Defendant Ravichandra K. Saligram has served as President, CEO, and director of the Company since November 2010.

12.     Defendant Warren F. Bryant has served as a director of the Company since 2004.

13.     Defendant Francesca Ruiz De Luzuriaga has served as a director of the Company since 1998.

14.     Defendant Joseph M. DePinto has served as a director of the Company since 2006.

15.     Defendant V. James Marino has served as a director of the Company since October 2011.

16.     Defendant William J. Montgoris has served as a director of the Company since July 2007.

17.     Defendant David M. Szymanski has served as a director of the Company since 2004.

18.     Defendants Gangwal, Saligram, Bryant, Luzuriaga, DePinto, Marino, Montgoris, and Szymanski are collectively referred to hereinafter as the "Individual Defendants."

19.     Defendant Office Depot is a Delaware corporation with its principal executive offices located at 6000 North Military Trail, Boca Raton, Florida 33496.

20.     Defendant Mapleby Holdings is a Delaware corporation and a wholly owned direct subsidiary of OfficeMax.

21.     Defendant Mapleby is a Delaware corporation and a wholly owned direct subsidiary of Mapleby Holdings.

22.     Defendant Merger Sub is a Delaware corporation and a wholly owned direct subsidiary of Office Depot.

23.     Defendant Merger Sub 2 is a Delaware limited liability company and a wholly owned direct subsidiary of Office Depot.

24.     Defendants Mapleby Holdings, Mapleby, Merger Sub, and Merger Sub 2 were formed solely for the purpose of entering into the Merger Agreement and consummating the Proposed Transaction, and have not conducted any business operations other than those incident to their formation.

25.     Collectively, OfficeMax, the Individual Defendants, Office Depot, Mapleby Holdings, Mapleby, Merger Sub, and Merger Sub 2 are referred to herein as the "Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

26.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of OfficeMax and owe them a duty of care, loyalty, good faith, candor, and independence.

27.     To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

   a.  adversely affects the value provided to the corporation's shareholders;

   b.  favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

   c.  adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

d. will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

28. In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

a. participating in any transaction where the Individual Defendants' loyalties are divided;

b. participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c. unjustly enriching themselves at the expense or to the detriment of the public shareholders.

## AIDING AND ABETTING

29. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

30. During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to: (i) permit Office Depot to attempt to eliminate the public shareholders' equity interest in OfficeMax pursuant to a defective sales process; (ii) permit Office Depot to buy the Company for an unfair price; and (iii) permit Office Depot to buy the Company without OfficeMax shareholders being fully informed of all material information relating to the Proposed Transaction. In furtherance of this plan and course of conduct, Defendants, and each of them, took the actions as set forth herein.

31.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting included, *inter alia,* the acts each of them are alleged to have committed in furtherance of the common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 on behalf of all holders of OfficeMax common stock who are being and will be harmed by Defendants' actions described below ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

33.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of February 20, 2013, there were approximately 86.75 million shares of OfficeMax common stock issued and outstanding. The actual number of public shareholders of OfficeMax will be ascertained through discovery.

b.     There are questions of law and fact which are common to the Class, including the following:

i)     whether the Individual Defendants have breached their fiduciary

7

duties with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

ii) whether the Individual Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

iii) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

34.    OfficeMax owns and operates warehouse-style office supply stores.  The Company provides office supplies and paper, print and document services, technology products and solutions, and furniture to businesses and consumers. OfficeMax consumers and business customers are served by approximately 29,000 associates through OfficeMax.com; OfficeMaxSolutions.com and Reliable.com; more than 900 stores in the U.S. and Mexico; and direct sales and catalogs. OfficeMax has been named one of the 2012 World's Most Ethical Companies, and is the only company in the office supply industry to receive Ethics Inside® Certification by the Ethisphere Institute.

35.    On February 20, 2013, the Company issued a press release announcing its fourth quarter and full year 2012 financial results. In connection with the announcement, Defendant Saligram stated: "We've been making tangible progress in executing against our strategic plan" adding that, "our execution during 2012 resulted in a significant increase in earnings per share, strong cash flow from operations, and reinstatement of a quarterly dividend. After completing our comprehensive review, we've also simplified our balance sheet and created greater clarity for our investors." Indeed, adjusted net income available to OfficeMax common shareholders was $68.5 million, or $0.78 per diluted share, in the full year 2012, compared to $53.3 million, or $0.61 per diluted share, in the full year 2011. Furthermore, during the full year 2012, OfficeMax generated $185.2 million of cash flow from operations compared to $53.7 million in the full year 2011.

### B.    The Proposed Transaction

36.    On or about April 25, 2012, Office Depot's board of directors, and management

held a meeting to analyze and review the potential benefits and synergies that could be realized in a combination of the businesses of Office Depot and OfficeMax.

37.     On May 14, 2012, Neil Austrian, chairman and chief executive officer of Office Depot and Defendant Saligram, president and chief executive officer of OfficeMax, met in San Francisco, California to discuss the potential strategic fit of the two businesses and the benefits of a potential merger in the context of structural challenges in the industry. Austrian informally discussed a possible acquisition transaction in which OfficeMax stockholders would receive $5.25 in cash plus one share of Office Depot common stock for each outstanding share of OfficeMax common stock and number of members of the OfficeMax board of directors would join the Office Depot board of directors.

38.     On June 7, 2012, the OfficeMax board of directors met telephonically to discuss the May 14, 2012 meeting between Austrian and Saligram. The OfficeMax board of directors considered the merits of engaging in further discussions with Office Depot.

39.     On June 21, 2012, Mr. Austrian sent a letter to Saligram indicating Office Depot's proposal for an acquisition transaction in which OfficeMax stockholders would receive $5.25 in cash plus one share of Office Depot common stock for each outstanding share of OfficeMax common stock. The letter indicated Office Depot's view that any required financing for such transaction could be readily obtained and preliminarily estimated potential annual synergies of the transaction at approximately $400 million.

40.     On July 20, 2012, Saligram and Gangwal met with members of Office Depot's board of directors, in New York to discuss the June 21, 2012 letter. During this meeting, participants also discussed, among other matters, BC Partners (which held a large position of

Office Depot preferred stock) and its position with respect to a potential transaction between Office Depot and OfficeMax.

41. On July 25-26, 2012, the OfficeMax board of directors met with members of management to, among other things, review Office Depot's proposal for a potential transaction. At this meeting, the OfficeMax board of directors determined that the June 21, 2012 proposal was not compelling given the relative financial position and market capitalization of the two companies. But, they concluded that OfficeMax should continue to explore a potential business combination transaction with Office Depot. In addition, the directors discussed the importance of clarifying the position of BC Partners with respect to the combined company.

42. On August 17, 2012, Defendants Gangwal and DePinto met with members of the Office Depot board of directors where they proposed that OfficeMax and Office Depot approach the transaction as a merger of equals. However, on August 31, 2012, Office Depot indicated that it would not agree to an all stock transaction but was amenable "in principle" to equal representation on the combined company's board of directors.

43. On September 4, 2012, OfficeMax sent a letter to Office Depot further describing OfficeMax's rationale for a merger of equals structure in which neither party would be viewed as the buyer or target. The letter highlighted the potential value of estimated synergies relative to the companies' market capitalizations and the cost to achieve such synergies, the desire to avoid increased leverage for the combined company, the importance of maintaining the parties' respective business franchises during the pendency of a transaction and the significant overlap between the stockholder bases of both companies at such time. OfficeMax indicated that it would be willing to discuss a possible transaction based upon the understanding of an all stock

combination and equal board representation.

44.     On September 13, 2012, Office Depot sent a letter indicating that it was willing to proceed with discussions based upon the understanding of a predominantly stock for stock combination with equal board representation and other indicia of a merger of equals. The letter proposed a transaction structure that would provide OfficeMax stockholders with shares of the combined company representing approximately 43-45% of the combined company's outstanding shares (assuming BC Partners did not convert its shares of Office Depot convertible preferred stock) as well as a modest cash component (either as a pre-transaction OfficeMax special dividend or as a portion of the merger consideration).

45.     On November 15, 2012, Boise Cascade Company (formerly known as Boise Cascade, L.L.C.) ("Boise Cascade") filed a registration statement on Form S-1 with the SEC related to a planned initial public offering. At this time, Boise Cascade was a wholly-owned subsidiary of Boise Cascade Holdings, L.L.C. a holding company in which OfficeMax holds a minority investment.

46.     On November 28, 2012, Gangwal, Marino and Saligram met with members of the Office Depot board of directors, in Washington, D.C., to discuss the key elements of a proposed merger of equals structure. The meeting resulted in the following terms:

> the parties would pursue an all stock merger structure with a fixed exchange ratio based on historical market capitalizations during a period prior to execution of a definitive agreement or another mutually agreed period in the event of unusual or unexpected circumstances;

> OfficeMax would be permitted to declare a special dividend to its stockholders in connection with proceeds from its investment in Boise Cascade Holdings;

> BC Partners would commit to the treatment of its shares of Office Depot convertible

preferred stock at the time of entry into a definitive merger agreement between Office Depot and OfficeMax;

the parties would have equal representation on the board of directors of the combined company for a period of four years following completion of the proposed transaction, with the chairman/lead director position rotating for two-year terms during such period;

with respect to selecting a chief executive officer for the combined company, the parties would hire a search firm and start a process about three to four months prior to the expected closing of the transaction, with the process to include the current incumbents in the mix of potential candidates and the search criteria to be established jointly by the parties;

until the appointment of a chief executive officer for the combined company, the combined company would have co-chief executive officers and co-chairman/lead directors; and

the process and timing for selecting senior management, the name and the headquarters location for the combined company would be as recommended by the chief executive officer for the combined company and based on a majority vote of the board of directors of the combined company.

47.    On December 14, 2012, Office Depot and OfficeMax entered into a mutual confidentiality and standstill agreement.

48.    Commencing on December 18, 2012 and continuing through February 20, 2013, management and advisors of Office Depot and OfficeMax engaged in reciprocal due diligence processes, coordinating the scope of responses to due diligence requests with the assistance of antitrust counsel to both parties. On December 19, 2012, the parties and their advisors held a preliminary organizational call on these matters, including the content of an initial due diligence request list and proposed data room procedures.

49.    On January 15, 2013, Defendant Saligram met with Austrian and was advised that Office Depot was reviewing various strategic alternatives with respect to Office Depot de México. In that connection, Austrian indicated that Office Depot's Mexican joint venture partner, Grupo

Gigante S.A.B. de C.V. ("Gigante"), had previously submitted an informal indication of interest to acquire Office Depot's interest in Office Depot de México for cash and indicated that a proposed price range of $650-730 million.

50.     On January 19, 2013, Skadden provided a draft merger agreement to Simpson Thacher, legal counsel to Office Depot. Through February 20, 2013, the parties and their representatives engaged in negotiations concerning the draft merger agreement, its exhibits, schedules, and various covenants.

51.     Commencing on January 31, 2013 and continuing through February 19, 2013, the parties engaged in negotiations concerning the exchange ratio for the anticipated transaction. At various times during this period, BC Partners indicated that it was unwilling to commit to the treatment of its shares of Office Depot convertible preferred stock prior to the execution of a definitive merger agreement between Office Depot and OfficeMax and wanted to retain its flexibility with respect to its position in Office Depot.

52.     In early February 2013, Office Depot's board of directors formed a committee to review, evaluate and discuss, and to supervise management's negotiation of, the treatment of Office Depot's convertible preferred stock owned by BC Partners.

53.     On February 11, 2013, Office Depot offered two alternative proposals for the exchange ratio in the proposed transaction: (1) an exchange ratio under which OfficeMax stockholders would hold shares of the combined company representing 45% of the combined company's outstanding shares (assuming BC Partners did not convert its shares of Office Depot convertible preferred stock), with OfficeMax permitted to distribute approximately $130 million to its stockholders in connection with proceeds from its investment in Boise Cascade Holdings

prior to the closing, or (2) an exchange ratio under which OfficeMax stockholders would hold shares of the combined company representing 47% of the combined company's outstanding shares (assuming BC Partners did not convert its shares of Office Depot convertible preferred stock), with no ability for OfficeMax to distribute proceeds from its investment in Boise Cascade Holdings prior to the closing.

54.     On February 13, 2013, BC Partners agreed to not sell any of its shares from the time of signing of the proposed transaction agreement until the Office Depot stockholder meeting to vote on the proposed transaction. However, BC Partners wished to retain flexibility to engage in transactions with respect to its Office Depot convertible preferred stock following the Office Depot stockholder meeting and to retain a less than 5% ownership level in the combined company upon completion of the proposed transaction.

55.     On February 14, 2013, Morgan Stanley communicated to J.P. Morgan a revised proposal, pursuant to which (1) OfficeMax stockholders would hold shares of the combined company representing approximately 46% of the combined company's outstanding shares (assuming BC Partners did not convert its shares of Office Depot convertible preferred stock), representing an exchange ratio of 2.69 shares of Office Depot common stock for each share of OfficeMax common stock with OfficeMax being permitted to distribute approximately $130 million to its stockholders in connection with proceeds from its investment in Boise Cascade Holdings prior to the closing and (2) Office Depot would retain the right to sell Office Depot's interest in Office Depot de México to Gigante without being required to obtain the consent of OfficeMax pursuant to the proposed transaction.

56.     Shortly thereafter J.P. Morgan advised Morgan Stanley that OfficeMax insisted on

a consent right regarding a potential sale of Office Depot's interest in Office Depot de México, but that OfficeMax agreed that its consent could not be unreasonably withheld.

57.     On February 18, 2013, BC Partners and Office Depot communicated to OfficeMax a revised proposal under which 50% of BC Partners' shares of Office Depot convertible preferred stock would be redeemed by Office Depot following receipt of the Office Depot stockholder approval of the transaction and BC Partners' stake would be reduced to less than 5% of the common equity of the combined company as of the closing.

58.     On the same day, *The Wall Street Journal* reported that OfficeMax and Office Depot were engaged in discussions concerning a possible transaction.

59.     Office Depot and OfficeMax also negotiated a voting agreement ("voting agreement") with BC Partners, pursuant to which BC Partners agreed, among other matters and upon the terms and subject to the conditions set forth in the voting agreement, to vote all of their shares of Office Depot convertible preferred stock, together with any other voting securities of Office Depot acquired by BC Partners after February 20, 2013, in favor of the Office Depot share issuance and the other actions contemplated by the merger agreement.

60.     On the evening of February 19, 2013, both Office Depot's board of directors and OfficeMax's board of directors unanimously voted to approve the merger agreement and the agreements with BC Partners and the transactions contemplated thereby and authorized their respective management to take actions designed to accomplish the transactions contemplated thereby.

61.     On the morning of February 20, 2013, Office Depot and OfficeMax executed the merger agreement and executed the definitive agreements with BC Partners contemplated by the

merger agreement. Office Depot and OfficeMax then issued a joint press release announcing the

transaction:

> NAPERVILLE, Ill. & BOCA RATON, Fla.--(BUSINESS WIRE)--Feb. 20, 2013-
> - OfficeMax Incorporated (NYSE:OMX) and Office Depot, Inc. (NYSE:ODP)
> today announced the signing of a definitive merger agreement under which the
> companies would combine in an all-stock merger of equals transaction intended to
> qualify as a tax-free reorganization. The transaction, which was unanimously
> approved by the Board of Directors of both companies, will create a stronger,
> more efficient global provider better able to compete in the rapidly changing
> office solutions industry. Customers will benefit from enhanced offerings across
> multiple distribution channels and geographies. The combined company, which
> would have had pro forma combined revenue for the 12 months ended December
> 29, 2012 of approximately $18 billion, will also have significantly improved
> financial strength and flexibility, with the ability to deliver long-term operating
> performance and improvements through its increased scale and significant
> synergy opportunities.
>
> Under the terms of the agreement, OfficeMax stockholders will receive 2.69
> Office Depot common shares for each share of OfficeMax common stock.
>
> "In the past decade, with the growth of the internet, our industry has changed
> dramatically. Combining our two companies will enhance our ability to serve
> customers around the world, offer new opportunities for our employees, make us
> a more attractive partner to our vendors, and increase stockholder value," said
> Neil Austrian, Chairman and Chief Executive Officer of Office Depot. "Office
> Depot and OfficeMax share a similar vision and culture, and will greatly benefit
> from drawing on the industry's most talented people, combining our best practices
> and realizing significant savings. We are confident that this merger of equals
> represents a new beginning for our two companies and will allow us to build a
> more competitive enterprise for the long term."
>
> "We are excited to bring together two companies intent on accelerating
> innovation for our customers and better differentiating us for success in a dynamic
> and highly competitive global industry," said Ravi Saligram, President and CEO
> of OfficeMax. "We are confident that there will be exciting new opportunities for
> employees as part of a truly global business. Together, we will have the
> opportunity to build on our strong digital platforms and to expand our
> multichannel capabilities to better serve our customers and to compete more
> effectively. Importantly, this merger of equals transaction will provide
> stockholders of both companies with a compelling opportunity to participate in
> the long-term upside potential of the combined company."

* * *

**Transaction Details**

Following the closing, the combined company's newly constituted Board of Directors will include equal representation and governance rights from each of the two companies. The parties have also agreed to form a selection committee made up of an equal number of independent Board members from each company that will oversee the search process for naming the CEO for the combined company. Both incumbent CEOs, as well as external candidates, will be considered in the search process. Neil Austrian, the Chairman and CEO of Office Depot, and Ravi Saligram, the President and CEO of OfficeMax will remain in their current positions through the completion of the search process.

The combined company's management team is expected to draw upon the experienced group of leaders from both companies. The combined company's name, marketing brands and corporate headquarters location are expected to be determined following the appointment of the CEO for the combined company.

The transaction is expected to close by the end of calendar year 2013, subject to stockholder approval from both companies, the receipt of regulatory approvals and other customary closing conditions.

Under the merger agreement, OfficeMax will have the ability to declare and pay to its common stockholders aggregate cash dividends of up to $131 million ($1.50 per common share) before the closing of the transaction. Payment of dividends would not affect the exchange ratio in the transaction.

In connection with the transaction, BC Partners, Inc. and its affiliates, which hold preferred stock representing approximately 22 percent of Office Depot on an as-converted basis, have agreed to vote in favor of the merger. In addition, BC Partners has agreed that as of the closing, its remaining equity stake will consist of common shares representing an amount no more than 5 percent of the voting capital stock of the combined company as a result of the combination of the redemption of preferred shares, conversion to common shares and open market sales of such common shares and repurchases by Office Depot. Following the closing, BC Partners will have no Board designees or other contractual governance rights related to the combined company.

J. P. Morgan Securities LLC served as exclusive financial advisor to OfficeMax, and provided a fairness opinion to the Board of OfficeMax, and Skadden, Arps,

Slate, Meagher & Flom LLP and Dechert LLP acted as legal counsel to OfficeMax.

Peter J. Solomon Company, L.P. and Morgan Stanley & Co. LLC acted as financial advisors and provided fairness opinions to the Board of Office Depot, and Simpson Thacher & Bartlett LLP acted as legal counsel to Office Depot. Kirkland & Ellis acted as legal counsel to the Board of Office Depot.

In connection with the transaction, Perella Weinberg Partners acted as financial advisors to the Transaction Committee of Office Depot's Board of Directors and Kirkland & Ellis LLP served as the Committee's legal advisor.

## C.     **The Unfair Price**

62.     On February 20, 2013, OfficeMax announced its financial results for the fiscal fourth quarter and full year ended December 29, 2012. Adjusted operating income in the full year 2012 was $139.2 million, or 2.0% of sales, compared to $118.2 million, or 1.7% of sales, in the full year 2011, which included the benefit of $8 million of operating income due to the additional week of operation; and adjusted net income available to OfficeMax common shareholders was $68.5 million, or $0.78 per diluted share, in the full year 2012, compared to $53.3 million, or $0.61 per diluted share, in the full year 2011, which included the benefit of $0.06 earnings per diluted share due to the additional week.

63.     In connection with the February 20, 2013 press release, Defendant Saligram lauded the Company's performance, stating as follows:

"We've been making tangible progress in executing against our strategic plan. Our execution during 2012 resulted in a significant increase in earnings per share, strong cash flow from operations, and reinstatement of a quarterly dividend. After completing our comprehensive review, we've also simplified our balance sheet and created greater clarity for our investors."

64.     During the full year 2012, OfficeMax generated $185.2 million of cash flow from operations compared to $53.7 in the full year 2011. OfficeMax invested $39.0 million in capital

expenditures in the fourth quarter of 2012 compared to $28.1 million in the fourth quarter of 2011. This cash flow from operations excludes any proceeds from Boise Cascade Holdings, L.L.C., all of which were received in February 2013. For the full year 2012, OfficeMax invested $87.2 million in capital expenditures compared to $69.6 million in 2011.

65.    In connection with the impressive full year 2012 performance, Bruce Besanko, EVP, Chief Financial Officer and Chief Administrative Officer of OfficeMax, stated as follows:

> "Strong cash flow and efforts to address legacy assets and liabilities translated into an improved balance sheet. Our continued strong financial position enables us to invest in our strategic objectives, which we believe will create long-term value for our shareholders."

66.    The failure of the Individual Defendants to secure an adequate price for the Company is apparent from the agreed upon merger consideration. As discussed herein, OfficeMax shareholders will receive 2.69 Office Depot shares for each share they own. OfficeMax, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction. In short, the Proposed Transaction undervalues OfficeMax.

67.    Furthermore, the exchange ratio is fixed at 2.69 shares of Office Depot common stock for each share of OfficeMax common stock, and will not be adjusted in the event of any change in the market price of either Office Depot's or OfficeMax's stock.. Even on February 15, 2013, 2.69 shares of Office Depot represented a premium of only 14.9% to the closing price of OfficeMax common stock on that same date. However, given the inflexible exchange ratio, there is a chance that OfficeMax's shareholder will receive no premium and may even be forced to accept a discount. Despite the announced merger, the respective stocks of the companies have not

traded at a fixed ratio. Rather, Office Depot has continued to perform significantly worse than OfficeMax. As of April 25, 2013, the exchange ratio of 2.69 would provide OfficeMax shareholders with an approximately 10% **discount** on the current market value of their shares. The merger consideration is therefore inadequate. The Proposed Transaction will deny Plaintiff the right to share proportionately and equitably in the true value of the valuable and profitable business that OfficeMax has created.

68.    Moreover, pursuant to the Merger Agreement, OfficeMax has the discretion to declare and pay to its common stockholders aggregate cash dividends of up to $131 million ($1.50 per common share) before the closing of the transaction and any such payment will not affect the exchange ratio in the transaction. However, although it may not affect the exchange ratio, the issuance of the $1.50 per share dividend drastically affects the premium or discount of the consideration ultimately received. For example: if OfficeMax issued the $1.50 per share dividend, shareholders could deduct that amount from OfficeMax's current share price, and then perform the conversion and comparison. At April 25, 2013's intraday prices of $11.23 and $3.76 for OfficeMax and Office Depot respectively, with the $1.50 per share dividend, and at an exchange of 2.69 per OfficeMax share, OfficeMax shareholders would receive a premium of approximately 4% for their shares. Although it is still inadequate, it is significantly better than receiving a 10% discount that will occur without the dividend. This concern has been echoed by shareholders of OfficeMax. On March 4, 2013, Neuberger Berman Holdings LLC, ("Neuberger") a shareholder with a 3.69% stake in OfficeMax, filed a Schedule 13D with the SEC. Therein they expressed, among other things, that they have concerns about the OfficeMax Board's conditional commitment to pay a special dividend to shareholders and would prefer that the Board formally

state their intention to declare such a dividend. Neuberger further expressed concerns with the value of the shares of Office Depot it would receive in the Proposed Transaction, especially in the absence of a sale by Office Depot of its assets located in Mexico. In light of these defects, and in the absence of their resolution, Neuberger advised that they will consider voting their shares against the Proposed Transaction.

69.     Thus, as these indicators make clear, OfficeMax, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

**D.      The Preclusive Deal Protection Devices**

70.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

71.     Section 8.2 of the Merger Agreement contains the termination fee provision. Section 8.2 provides that under specified circumstances, including with respect to the Company's entry into an agreement with respect to a superior proposal, OfficeMax must pay a steep $30 million termination fee that will all but ensure that no competing offer will be forthcoming.

72.     The Merger Agreement also contains a strict "no shop" provision prohibiting the Board of OfficeMax from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations ("No Solicitation Provision"). The No Solicitation Provision restricts the Company's ability to solicit alternative acquisition proposals from third parties and to provide non-public

information to and engage in discussions or negotiations with third parties regarding alternative acquisition proposals.

73.     Section 6.10 precludes the Company from: (i) participating in any negotiations regarding, or furnishing to any person any material nonpublic information with respect to, any Competing Proposal; (ii) engaging in discussions with any person with respect to any Competing Proposal; (iii) approving or recommending any Competing Proposal; (iv) withdrawing, amending, or modifying in a manner adverse to the Company's Board's recommendation; (v) entering into any letter of intent, memorandum of understanding or similar document or any agreement, document or commitment providing for any Competing Proposal. Specifically, Section 6.10 states:

> (a) Subject to Section 6.10(c) through Section 6.10(f), Office Depot agrees that, from the date of this Agreement until the Closing or, if earlier, the termination of this Agreement in accordance with Article VIII, neither it nor any of its subsidiaries shall, and that it shall use its reasonable best efforts to cause its and its subsidiaries' directors, officers, employees, agents, investment bankers, attorneys, accountants and other representatives ("Representatives") not to, directly or indirectly, (i) initiate or solicit or knowingly encourage any inquiries with respect to, or the making of, an Office Depot Acquisition Proposal, (ii) engage in any negotiations concerning, or provide any confidential information or data to any Person relating to, an Office Depot Acquisition Proposal, (iii) approve or recommend, or propose publicly to approve or recommend, any Office Depot Acquisition Proposal, (iv) approve or recommend, or propose publicly to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, option agreement or other similar agreement relating to any Office Depot Acquisition Proposal (each an "Office Depot Acquisition Agreement"), (v) amend or modify, or exempt any Person from the operation of, the Office Depot Rights Agreement, or (vi) propose publicly or agree to do any of the foregoing relating to any Office Depot Acquisition Proposal.

74.     This high termination fee coupled with the No Solicitation Provision will all but ensure that no competing offer will be forthcoming.

75.     Furthermore, pursuant to Section 6.1 of the Merger Agreement, should an unsolicited bidder arrive on the scene with a superior acquisition proposal, OfficeMax must provide Office Depot advance written notice of its intent to either: (1) change its recommendation to the Company's shareholders; or (2) enter into a definitive agreement with respect to the superior acquisition proposal.  Further, OfficeMax shall provide Office Depot written notice of any alternative proposal or offer within 48 hours of such event and copies of any correspondence to or from any entity making such alternative proposal.  In addition to OfficeMax having to give Office Depot notice of any offer and its intentions with respect thereto, OfficeMax must also provide Office Depot with names and all the details and material terms of the superior acquisition proposal. In other words, the Merger Agreement provides Office Depot's access to any rival bidder's information and allows Office Depot a free right to top any superior offer.

**E.      Defendants Breached Their Fiduciary Duties and Section 14 of the Exchange Act by Issuing a Materially False and Misleading Registration Statement**

76.     It is critical that OfficeMax's shareholders receive complete and accurate information about the Proposed Transaction. To date, Defendants have failed to provide the Company's shareholders with that information. As set forth in more detail below, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the process behind the Proposed Transaction; and (b) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinions" provided by J.P. Morgan on behalf of OfficeMax, and PJSC and Morgan Stanley on behalf of Office Depot.

**1.      The Registration Statement Fails to Adequately Describe the Process and Background That Resulted in the Proposed Transaction**

77.     The Registration Statement fails to fully and fairly disclose certain material information concerning the Proposed Transaction, including (among other things):

    a.  On page 61, the Registration Statement states that in early April 2012, Office Depot evaluated the possibility of a potential business combination with OfficeMax. The Registration Statement also states that Office Depot had *previously* engaged financial advisors PJSC and Morgan Stanley in this "context," indicating that Office Depot was exploring the possibility of a transaction with OfficeMax before early April 2012. The Registration Statement fails to disclose when Office Depot first began to explore the possibility of a potential business combination with OfficeMax. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

    b.  On page 62, the Registration Statement states that Office Depot proposed a transaction in which OfficeMax stockholders would receive $5.25 in cash plus one share of Office Depot common stock for each outstanding share of OfficeMax common stock. The Registration Statement fails to disclose Office Depot's basis for arriving at this offer. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

    c.  On page 63, the Registration Statement states that the Board found that Office Depot's letter did not present a compelling proposal, but that OfficeMax should continue to explore a potential business combination with Office Depot. The

Registration Statement fails to disclose the reasons that the Board believed OfficeMax should continue to explore a possible business combination with Office Depot. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

d.  On page 63, the Registration Statement states that, with respect to a possible business combination with Office Depot, OfficeMax would need to address certain "social issues" so as to preserve OfficeMax's business franchise. The Registration Statement fails to disclose these "social issues." This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

e.  On page 64, the Registration Statement states that Office Depot proposed a transaction structure that would provide OfficeMax stockholders with shares of the combined company representing approximately 43-45% of the combined company's outstanding shares, assuming BC Partners did not convert its shares of Office Depot convertible preferred stock. The Registration Statement fails to disclose Office Depot's basis for arriving at a proposed ownership of 43-45%. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

f.  On page 64, the Registration Statement states that Office Depot proposed a transaction structure that would provide OfficeMax stockholders with shares of the combined company representing approximately 43-45% of the combined

company's outstanding shares, assuming BC Partners did not convert its shares of Office Depot convertible preferred stock. The Registration Statement fails to disclose the percentage of ownership in the combined company for OfficeMax stockholders assuming BC Partners *did* convert its shares of Office Depot preferred stock. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

g. On page 64, the Registration Statement states that the "social issues," previously identified but not fully explained, had the potential to affect the combined company's ability to realize the anticipated synergies from the Proposed Transaction. The Registration Statement fails to disclose the reasons that these social issues could affect the combined company's ability to realize the anticipated synergies. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

h. On page 67, the Registration Statement states that Office Depot and OfficeMax entered into a mutual confidentiality and standstill agreement. The Registration Statement fails to disclose whether the standstill agreement contained a highly restrictive "No Ask, No Waiver" provision. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

i.  On page 67, the Registration Statement states that between January 15 and February 19, 2013, members of management of Office Depot and OfficeMax reviewed and refined estimates of the potential synergies in connection with the Proposed Transaction. On page 73, the Registration Statement states that Office Depot's management estimated that the annual synergies could be between $400 to $600 million for the combined company. The Registration Statement fails to disclose the basis and reasons for revising the proposed annual synergies from $400 million, to a range of $400 to $600 million. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

j.  On page 69, the Registration Statement states that executives of OfficeMax and Office Depot discussed "certain open issues" in the Proposed Transaction on February 6, 2013. The Registration Statement fails to disclose the open issues that were discussed during this meeting. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

k.  On page 72, the Registration Statement states that on February 15, 2013, OfficeMax "insisted" on a consent right concerning the potential sale of Office Depot's interest in Office Depot de México, and that OfficeMax was not prepared to proceed with the Proposed Transaction without such consent rights. The Registration Statement fails to disclose the reasons that the consent right was so critical a right to OfficeMax. This omission is material because without the omitted

information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties;

l.  On page 72, the Registration Statement states that Office Depot's board of directors discussed the potential consequences of OfficeMax's requested consent right. The Registration Statement fails to disclose these potential consequences. This omission is material because without the omitted information, OfficeMax's public shareholders are unable to assess whether the Board fulfilled its fiduciary duties.

**2.   The Registration Statement Fails to Provide the Complete Financial Projections for OfficeMax and Office Depot**

78.    The Registration Statement provides a summary of the Revenues, EBIDTA, and EBIT for Office Depot for the fiscal years 2013-2016, under a management case and management sensitivity case. The Registration Statement fails to disclose the full set of financial projections related to Office Depot, including, but not limited to, the synergy projections and capital expenditure projections that formed the basis of PJSC's *Pro Forma Analysis*.

79.    The Registration Statement provides a summary of the Revenues, EBIDTA, and EBIT for OfficeMax for fiscal years 2013-2016, under a management case and management sensitivity case. The Registration Statement fails to disclose the full set of financial projections related to OfficeMax.

80.    The Registration Statement fails to disclose the full set of financial projections for OfficeMax for fiscal years 2013-2022, which were prepared by OfficeMax management, and reviewed and analyzed by J.P. Morgan. These include, but are not limited to, the unlevered cash

flows developed by management for fiscal years 2013-2022 that formed the basis for J.P. Morgan's Relative Discounted Cash Flow Analysis.

81.    The Registration Statement fails to disclose the full set of financial projections for Office Depot for fiscal years 2013-2022, which were prepared by OfficeMax management, and reviewed and analyzed by J.P. Morgan. These include, but are not limited to, the unlevered cash flows developed by management for fiscal years 2013-2022 that formed the basis for J.P. Morgan's Relative Discounted Cash Flow Analysis.

### 3.    The Registration Statement Fails to Disclose Material Facts Concerning PJSC's Fairness Opinion

82.    In the Registration Statement, PJSC describes its fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of PJSC's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, OfficeMax's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

#### *Equity Research Analyst Price Targets (pages 90-91)*

83.    The Registration Statement fails to disclose material details concerning the analyses that PJSC performed in connection with the *Equity Research Analyst Price Targets*. The Registration Statement fails to disclose the actual price targets for OfficeMax observed by each of the thirteen analysts, and the actual price targets for Office Depot observed by each of the eleven analysts. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what

weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Selected Publicly Traded Company Analysis (pages 91-92)

84. The Registration Statement fails to disclose material details concerning the analyses that PJSC performed in connection with the *Selected Publicly Traded Company Analysis*. The Registration Statement fails to disclose the multiples for Enterprise Value/2012 Revenues, Enterprise Value/2012 EBITDA, Enterprise Value/2012 EBIT, Enterprise Value/2013P Revenues, Enterprise Value/2013P EBITDA, Enterprise Value/2013P EBIT, Stock Price/2013P EPS, and Stock Price/2014P EPS that PJSC observed for each of the three companies that it analyzed. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

85. The Registration Statement fails to disclose the actual criteria and method that PJSC used in selecting a valuation range of $9.60-$14.25 for OfficeMax common stock using the management case, and a valuation range of $9.60-$13.80 for OfficeMax common stock using the sensitivity case. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

86. The Registration Statement fails to disclose the actual criteria and method that PJSC used in selecting a valuation range of $2.00-$4.50 for Office Depot common stock using the management case and the sensitivity case. This omission is material because without this

information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

87.    The Registration Statement fails to disclose the reasons that PJSC excluded the $129 million distribution to OfficeMax shareholders when calculating the implied exchange ratios, but included the $129 million distribution to OfficeMax shareholders when calculating OfficeMax's cash balance (and therefore its enterprise value and the resulting multiples). This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Discounted Cash Flow Analysis (pages 92-93)

88.    The Registration Statement fails to disclose material details concerning the analyses that PJSC performed in connection with the *Discounted Cash Flow Analysis*. The Registration Statement fails to disclose the assumptions that PJSC used to arrive at a discount rate of 10.0% to 12.0%. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Precedent Merger of Equals Transaction Analysis (page 95)

89.    The Registration Statement fails to disclose material details concerning the analyses that PJSC performed in connection with the *Precedent Merger of Equals Transaction Analysis*. The Registration Statement fails to disclose the multiples that PJSC observed for each of

the 25 precedent transactions. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Pro Forma Analysis (page 95)

90.     The Registration Statement fails to disclose material details concerning the analyses that PJSC performed in connection with the *Pro Forma Analysis*. The Registration Statement fails to disclose the criteria and method that PJSC used to select the synergy and capital expenditure values for 2014, 2015, and 2016. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### 4.     The Registration Statement Fails to Disclose Material Facts Concerning Morgan Stanley's Fairness Opinion

91.     In the Registration Statement, Morgan Stanley describes its fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Morgan Stanley's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, OfficeMax's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Equity Research Analyst Price Targets (pages 101-102)

92.     The Registration Statement fails to disclose material details concerning the

analyses that Morgan Stanley performed in connection with the *Equity Research Analyst Price Targets*. The Registration Statement fails to disclose the actual price targets for OfficeMax observed by each of the 13 analysts, and the actual price targets for Office Depot observed by each of the 14 analysts. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

93. The Registration Statement fails to disclose the reason that Morgan Stanley applied a discount rate to the range of selected equity analyst price targets for Office Depot common stock, and the method and assumptions used to arrive at the 10% discount rate. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

94. The Registration Statement fails to disclose the reason that Morgan Stanley applied a discount rate to the range of selected equity analyst price targets for OfficeMax common stock, and the method and assumptions used to arrive at the 9% discount rate. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

95. The Registration Statement fails to disclose the price per share value range that Morgan Stanley observed after reducing the per share value of OfficeMax common stock to account for the BCH dividend. This omission is material because without this information,

OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Comparable Company Analysis (pages 102-103)

96.     The Registration Statement fails to disclose material details concerning the analyses that Morgan Stanley performed in connection with the *Comparable Companies Analysis*. The Registration Statement fails to disclose the metrics that Morgan Stanley observed for each of the three selected companies, and which generated the respective reference ranges of 3.5x to 5.5x, and 3.0x to 5.0x. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### Discounted Cash Flow Analysis (pages 103-104)

97.     The Registration Statement fails to disclose material details concerning the analyses that Morgan Stanley performed in connection with the *Discounted Cash Flow Analysis*. The Registration Statement fails to disclose the assumptions that Morgan Stanley used to arrive at the discount rates of 8.0% to 10.0% and 7.0% to 9.0% for Office Depot and OfficeMax, respectively. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

98.     The Registration Statement fails to disclose the criteria and assumptions that

Morgan Stanley used in selecting the multiples of 4.0x to 5.0x and 3.5x to 4.5x, and which were multiplied by 2017P EBITDA for Office Depot and OfficeMax. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

99. The Registration Statement states that Morgan Stanley assumed conversion of the Office Depot convertible preferred stock into Office Depot common stock at a conversion price "in excess of $5.00." The Registration Statement fails to disclose the actual price that Morgan Stanley used in its analysis. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

**5. The Registration Statement Fails to Disclose Material Facts Concerning J.P. Morgan's Fairness Opinion**

100. In the Registration Statement, J.P. Morgan describes its fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of J.P. Morgan's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, OfficeMax's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

*Selected Publicly Traded Company Analysis (pages 111-112)*

101. The Registration Statement fails to disclose material details concerning the

analyses that J.P. Morgan performed in connection with the *Selected Publicly Traded Company Analysis*. The Registration Statement fails to disclose the multiples for Firm Value/CY 2013 EBITDA and Firm Value/CY 2014 EBITDA that J.P. Morgan observed for each of the twelve companies. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

102.    The Registration Statement fails to disclose the criteria and method that J.P. Morgan used to select the valuation range of 4.5x to 5.5x estimated 2013 EBIDTA and 4.25x to 5.25x estimated 2014 EBITDA. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### *Relative Discounted Cash Flow Analysis (pages 113-114)*

103.    The Registration Statement fails to disclose material details concerning the analyses that J.P. Morgan performed in connection with the *Relative Discounted Cash Flow Analysis*. The Registration Statement fails to disclose the assumptions that J.P. Morgan used to arrive at the discount rate range of 11.0% to 13.0%. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### *Equity Research Analyst Price Targets (page 115)*

104. The Registration Statement fails to disclose material details concerning the analyses that J.P. Morgan performed in connection with the *Equity Research Analyst Price Targets*. The Registration Statement fails to disclose the actual price targets for OfficeMax and Office Depot observed by each of the ten selected analysts. This omission is material because without this information, OfficeMax's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

105. Plaintiff repeats and realleges each allegation set forth herein.

106. The Individual Defendants have violated fiduciary duties owed to public shareholders of OfficeMax.

107. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to obtain for the public shareholders of OfficeMax the highest value available for OfficeMax in the marketplace.

108. As demonstrated by the allegations above, the Individual Defendants breached their fiduciary duties owed to the shareholders of OfficeMax because they failed to take steps to maximize the value of OfficeMax to its public shareholders in a change of control transaction.

109. As a result of the actions of defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive the highest available value for their equity interest in OfficeMax. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to

the irreparable harm of the members of the Class.

110.    Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

**SECOND CAUSE OF ACTION**
**(Against Office Depot and Merger Sub for Aiding and Abetting the**
**Individual Defendants' Breaches of Fiduciary Duty)**

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    Office Depot and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to the public shareholders of OfficeMax, and has participated in such breaches of fiduciary duties.

113.    Office Depot and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein. In so doing, Office Depot and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

114.    Plaintiff has no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**(Brought Individually Against the Individual Defendants and OfficeMax**
**for Violation of Section 14 of the Exchange Act)**

115.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39

116.    The Individual Defendants and OfficeMax have caused the Recommendation Statement to be issued with material omissions.

117.    The Recommendation Statement is an essential link in the accomplishment of the Proposed Transaction.

118.    In the exercise of reasonable care, the Individual Defendants and OfficeMax should have known that the Recommendation Statement omits material facts that are necessary to render it non-misleading.

119.    The omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his right to make a fully informed decision if such omissions are not corrected prior to the shareholder vote on the Proposed Transaction.

## JURY DEMAND

120.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best available terms for shareholders;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of

the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

Respectfully submitted,

ERIC HOLLANDER, individually and on behalf of all others similarly situated,

By: _____

Larry D. Drury
LARRY D. DRURY, LTD.
100 North LaSalle Street, Suite 1010
Chicago, IL  60602
312/346-7950
Atty. No. 0681024

David A.P. Brower
Brian C. Kerr
BROWER & PIVEN
475 Park Avenue South, 33rd Floor
New York, NY  10016
212/501-9000
(Pro Hac Vice to be filed)

Evan J. Smith
BRODSKY & SMITH, LLC
Two Bala Plaza, Suite 602
Bala Cynwyd, PA  19004
610/667-6200
(Pro Hac Vice to be filed)